# United States Court of Appeals
## For the First Circuit

No. 20-1346

UNITED STATES OF AMERICA,

Appellee,

v.

WILLIAM GREGORIO AGRAMONTE-QUEZADA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]

Before

Howard, Chief Judge,
Thompson, Circuit Judge,
and Woodcock,* District Judge.

Tanaira Padilla-Rodríguez for appellant.

Andrew C. Noll, with whom W. Stephen Muldrow, United States Attorney, Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, Nicholas L. McQuaid, Acting Assistant Attorney General, Robert A. Zink, Acting Deputy Assistant Attorney General, Kelley Brooke Hostetler, Criminal Division, Appellate Section, U.S. Department of Justice, and Vanessa E. Bonhomme and Angela J. Clifford-Salisbury, Assistant United States Attorneys, were on brief, for appellee.

---

* Of the District of Maine, sitting by designation.

March 25, 2022

**WOODCOCK, District Judge**.  On October 23, 2019, a jury convicted William Gregorio Agramonte-Quezada ("Agramonte") of one count of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and one count of importation of cocaine in violation of 21 U.S.C. §§ 952 and 960.  On February 27, 2020, the district court imposed the mandatory minimum sentence of one-hundred-twenty months imprisonment, to be followed by a five-year term of supervised release.

Agramonte appeals his convictions and sentence on three grounds.  He contends the district court abused its discretion in (1) admitting evidence, including the testimony of a canine handler, that a drug sniffing dog alerted to his vehicle, on the same ferry route eighteen days prior, as "other-acts" evidence pursuant to Federal Rule of Evidence 404(b); (2) admitting testimony of a Homeland Security Investigations agent about the practices of drug traffickers smuggling drugs into Puerto Rico as that of a lay witness opinion pursuant to Federal Rule of Evidence 701; and (3) failing to sua sponte order a competency evaluation prior to (or during) his sentencing hearing.  We affirm the convictions and sentence.

## I.    Background

### A.    The Charges

The January 17, 2019 two-count indictment in this case charged that on December 28, 2018, Agramonte possessed five kilograms or more of cocaine with the intent to distribute it, an alleged violation of 21 U.S.C. § 841(a)(1), and on the same date, that he imported a controlled substance, namely five kilograms or more of cocaine, an alleged violation of 21 U.S.C. §§ 952 and 960. On January 22, 2019, he pleaded not guilty. Agramonte went to trial on October 21, 2019 and was found guilty on both counts on October 23, 2019. In reciting the evidence presented at Agramonte's trial, we adopt a "'balanced-presentation' approach." United States v. García-Sierra, 994 F.3d 17, 23 (1st Cir. 2021) (quoting United States v. Rodríguez-Soler, 773 F.3d 289, 290 (1st Cir. 2014)).

### B.    The Crimes

On December 28, 2018, U.S. Customs and Border Protection ("CBP") officers conducting inbound inspections for ferry arrivals to San Juan, Puerto Rico from the Dominican Republic referred for further inspection a white Ford Econoline van after CBP drug-detection dog Honzo signaled a positive alert to the front of the van. CBP officers contacted the driver and sole occupant of the vehicle, Agramonte, whose bill of lading stated that he had brought appliances and household goods from Puerto Rico to the Dominican

- 4 -

Republic.  Upon secondary inspection, CBP officers discovered that the radiator of the Ford van had been modified in that it was abnormally large with fresh paint and non-factory weld marks. Officers removed the radiator, revealing fourteen brick shaped objects, later confirmed to contain approximately thirteen kilograms of cocaine, with a street value of approximately $300,000.

The December 28 border incident was not Agramonte's first instance of a canine alert on his vehicle at the ferry terminal in San Juan.  Eighteen days earlier on December 10, 2018, having traveled to the Dominican Republic, Agramonte returned to Puerto Rico on the same ferry in a different Ford Econoline van—this time yellow.  Agramonte acquired title to the yellow van in Puerto Rico on November 1, 2018 and made a reservation on November 27 to leave for the Dominican Republic the next day.  On December 10, 2018, as Agramonte was making his way back through customs in San Juan, a CBP detection dog alerted to Agramonte's yellow van and the officers inspected the van.  During their inspection, CBP officers noticed the van had been modified and was equipped with a bigger-than-usual radiator, had fresh paint, and contained non-factory weld marks.  During the officers' inspection, CBP drug-detection dog Baku alerted to the van's front engine area.  The officers spent two to three hours unsuccessfully attempting to remove the radiator before letting Agramonte leave with his van.

Approximately five days later, Agramonte purchased a different Ford Econoline van, this time white, which he was using on December 28, 2018, when CBP stopped him again upon his return from a trip to the Dominican Republic.

## II.  The Issues

### A.  The Admissibility of the December 10, 2018 Incident

#### 1.  The Pretrial Notices and Motions

On September 30, 2019, the government filed a notice of intent to introduce "other-acts" evidence pursuant to Federal Rule of Evidence 404(b), focusing on Agramonte's December 10, 2018 encounter with CBP, including Baku's sniff and alert on the van's radiator area. The government contended that this evidence was admissible as proof of opportunity, knowledge, intent, identity, and absence of mistake.

On October 2, 2019, Agramonte objected to the "other-acts" evidence on the grounds that the December 10 canine alert was inadmissible character evidence and not probative of what happened on December 28, 2018, as a canine alert is not necessarily proof of a crime or wrongful act and CBP did not find any drugs on December 10.

On October 3, 2019, after the lapse of the district court's September 30 discovery deadline, Agramonte filed a related motion in limine to exclude all canine evidence, arguing that the government had not provided canine-related discovery, namely

reports of the December 10 event or identifying information for Baku, the December 10 canine, and for Baku's CBP handler.

### 2. The October 11, 2019 Pretrial Conference

The district court and counsel discussed the December 10, 2018 incident at the October 11, 2019 pretrial conference. The government requested the opportunity to file a motion in limine and to respond to Agramonte's objection and motion and Agramonte requested discovery concerning the reliability of the canines. The district judge ordered the government to file an amended designation of evidence by October 16 and gave Agramonte until October 18 to oppose the new government designation. The district judge also ordered the government to provide specific information as to the reliability of the canines (training and agreement of confidentiality) and to file a motion for protective order.[1]

### 3. The Post-Pretrial Conference Motions and Orders

On October 16, 2019, the government filed an amended notice of intent to introduce expert testimony, designating four law enforcement officers as potential witnesses and attaching their curricula vitae. Two of the four experts were CBP canine enforcement officers: Javier Quiles, handler of Baku on December

---

[1] On October 17, 2019, the government filed a motion for protective order concerning the certifications of the canine officers and the certifications and training records of the canines. The district court granted the motion for protective order the same day.

10, 2018, and Adriel Castillo, handler of Honzo on December 28, 2018.

On October 17, 2019, the government filed its reply to Agramonte's opposition to its intent to introduce evidence of the December 10 alert. In its reply, the government first argued that the evidence was admissible to explain why CBP agents focused on Agramonte's radiator on December 28, contending they remembered seeing Agramonte on December 10 in a different Ford Econoline with similar modifications. The government went on to emphasize that the previous dog alert "is relevant in showing that the defendant was, at the very least, alerted to the fact that law enforcement detected something in" the van he was driving on December 10, that it goes to his motive to "intentionally change[] vehicles to avoid further suspicion," and that this evidence supports a "continuing plan to transport controlled substances from the Dominican Republic to Puerto Rico in the radiator of his vehicle." The government explained that it anticipated that Agramonte would "raise the matter of his mental condition, and lack of awareness or understanding" that he was smuggling drugs, and maintained that the evidence should be admitted pursuant to Federal Rules of Evidence 404(b) and 403.

### 4. The Pretrial Order on Rule 404(b) Evidence

On October 18, 2019, the district court granted the government's motion to admit Rule 404(b) evidence of the December

10 incident. The district judge, relying on and citing Rule 404(b), concluded that evidence of the December 10 incident was admissible to prove "state of mind, preparation, plan, knowledge, intent[,] modus operandi, absence of mistake or lack of accident." Agreeing with Agramonte that this evidence could not be used as evidence that he committed a crime on December 10, the district court limited the testimony to "indicating that the K-9 alerted positive consistent with its training and the results of any secondary inspection by law enforcement agents was negative."

### 5. The Rule 404(b) Evidence at Trial

At trial, the government presented the testimony of CBP Officer Arnaldo Carmona, who was present for both the December 10 and December 28 incidents, and CBP Canine Enforcement Officer Javier Quiles, Baku's handler on December 10. Iglesias and Quiles testified substantially to the events on December 10, 2018 described above.

### 6. The Closing Arguments on the Rule 404(b) Evidence

In its closing, the government summarized the law enforcement testimony linking the December 10 and December 28 incidents, "[b]oth of them including and involving this defendant. Both of them involving two different vehicles, but Ford Econoline vans. And both of them involving a positive alert from the canine of narcotics." The government continued:

First one, got lucky. He got lucky. But the second one, members of the jury, the second one, that the agents were actually able to remove the radiator, that one, that's where we know exactly what the defendant was doing. That's where we know exactly what this defendant intended to do on December 28, 2018.

In response, the defense stressed that on December 10, 2018, even though Baku alerted to Agramonte's van, CBP did not find any drugs. Defense counsel observed that the officers spent more than three hours trying to remove the radiator on December 10 but could not do so. The defense also reminded the jury that, even though the CBP officers were sure that Agramonte had drugs in his van on December 10, they let him go.

During its rebuttal closing argument, the government again framed the December 10 incident:

> Now, the incident about December 10, that's just a tool, members of the jury. That's just a tool for you to be able to assess and look at it and reasonably infer what the defendant intended to do on December 28. That shows that this isn't a mistake, this isn't an accident. This shows that this defendant knew what was happening. This shows that the defendant intended to commit this crime, or both crimes, rather.
>
> Now, it's clear, the witnesses did not say the canine is a hundred percent effective. What they said is they give positive alerts, and there are no false positives in the field, because the odor can actually be there. The only time you can get a false positive is in a sterile environment. And this 1995 yellow Ford Econoline van is not a sterile environment. And so the dog detected the odor

of narcotics on that vehicle. That's what
we're saying.

And then we asked that you draw the next step
of the conclusion. You connect the dots.
Detected an odor of narcotics on December 10,
and then detected an odor of narcotics on
December 28. And on December 28, this car was
loaded with kilograms of cocaine.

### 7. The Jury Instruction on Rule 404(b) Evidence

In its jury instructions, the district court delivered
a Rule 404(b) limiting instruction,[2] telling the jury that it could
not use evidence of similar acts to infer that "because of his
character, defendant carried out the acts in this case" and that

---

[2]     The district court's Rule 404(b) instruction read:

> You may consider such evidence only for the
> limited purpose of deciding whether the
> defendant had the state of mind or intent
> necessary to commit the crime charged in the
> Indictment, or whether the defendant had a
> motive or the opportunity to commit the acts
> charged in the Indictment, or whether the
> defendant acted according to a plan or in
> preparation for commission of a crime, and
> whether the defendant committed the acts he is
> on trial for by accident or mistake.
> Remember, this is the only purpose for which
> you may consider evidence of defendant's prior
> similar acts. Even if you find the defendant
> may have committed similar acts in the past,
> this is not to be considered as evidence of
> character to support an inference that
> defendant committed the acts charged in this
> case.

Although Agramonte objected to the admission of Rule 404(b)
evidence, he did not object to the language of this instruction at
trial and has not challenged the wording of the Rule 404(b)
instruction on appeal.

- 11 -

it could only use evidence of the prior similar act to decide whether Agramonte had the requisite state of mind or intent, had a motive or opportunity to commit the offense, "acted according to a plan or in preparation for commission" of the offense, or committed the offense "by accident or mistake."

**B.    The Lay Opinion Testimony of Agent Fernández**

  **1.    The Pretrial Motions Regarding Agent Fernández's Testimony**

On October 16, 2019, the government announced its intent to introduce the expert witness testimony of Homeland Security Investigations ("HSI") group supervisor and Special Agent Yuany Fernández.[3]  The government represented that Agent Fernández, who had experience in narcotics operations and interventions, would testify about the wholesale and street value of cocaine and the manner and methods of drug trafficking organizations' operations, including the use of knowing and unknowing couriers.

On October 17, 2019, Agramonte filed motions in limine and a motion for a continuance so he could review the government's latest disclosures and possibly retain a canine expert.  In his first motion to exclude Agent Fernández's testimony, Agramonte submitted his "blind mule" theory, citing recent headlines in which

---

[3]    To be more precise, the government provided Special Agent Fernández's expert designation in an excess of caution, taking the position that First Circuit law does not require an expert designation for law enforcement officers in these circumstances.

- 12 -

people were tricked into or unaware of carrying contraband into the United States. Agramonte objected to Agent Fernández providing so-called "overview testimony." Agramonte also urged the district court to exclude evidence from the government's "discovery 'dump/disclosure'" in part because the government filed its amended designation on October 17, 2019, one day after the court-imposed October 16, 2019 deadline for an amended designation of evidence.

On October 20, 2019, Agramonte filed an additional motion in opposition to Agent Fernández testifying as a lay witness opinion, insisting his proposed testimony "constitutes an inadmissible form of expert opinion evidence." Agramonte argued that Agent Fernández would impermissibly opine on the "ultimate" jury issue of knowledge and scienter, and moreover that his testimony would be unnecessary and unduly prejudicial.

## 2.  The District Court's October 18, 2019 Order

On October 18, 2019, the district court issued an order denying Agramonte's motion in limine to exclude any evidence produced in the government's late designation, finding that Agramonte did not and could not assert prejudice from the government's filing 10 minutes after the October 16 midnight deadline. The district court also denied Agramonte's request for continuance, reasoning that the defense team's busy trial schedule was not a good enough reason to warrant a continuance and that any

- 13 -

government disclosure delays were minor.[4]  Finally, the district court denied Agramonte's motion in limine as to Agent Fernández, noting that "[n]othing within the [government's] proffer suggests that Agent Fernández will be among the first witnesses to be called or that his testimony will be an 'overview testimony,'" rather than that of a lay witness admissible under Federal Rule of Evidence 701.  The district court cautioned:

> Of course, the government will have to lay proper foundations as to the agent's years of service, field work, and investigation conducted which constitutes the basis of any such knowledge of drug trafficking practices and modus operandi.  Similarly, any testimony as to "knowing and unknowing" couriers, if relevant, is expected to have relevance to the factual scenario of the case, that is to general practices in local borders and not anywhere else.  While so testifying, the witness may not engage in conclusory opinions and determinations as to an element of the offense or defendant's culpability.

### 3.  The Trial Testimony of Agent Fernández

On the third day of trial, the government called Agent Fernández as its last witness.  After describing his eighteen years of border patrol and law enforcement work experience, and the

---

[4]  The government filed its amended designation of evidence on October 17, 2019 at 0:10 AM AST.  In his motion in limine, Agramonte argued that "[a]ll discovery or evidence that was provided today [October 17] should be excluded as being late."  On October 18, 2019, the district court denied his request, reasoning that "[w]hile it is true that the government filed during morning hours (00:10 a.m.) of October 17th, 2019, it is also true that the defense cannot and has not asserted prejudice from a filing made 10 minutes after midnight."

extent of his undercover training in the narcotics field, Agent Fernández explained his current role as an undercover group supervisor with Homeland Security and spoke generally about confidential informants, controlled buys, and other means of infiltrating trafficking operations. Agent Fernández also described how cocaine "bricks" are wrapped and transported and summarized CBP's criteria and protocols in conducting vehicle searches.

After the court sustained Agramonte's objections to the Agent's testimony about the specifics of cocaine production, Agent Fernández proceeded to focus on how cocaine travels to Puerto Rico, laying out different trafficking pathways. He explained his understanding, based on years of work undercover and with confidential informants, of how drug packages can be hidden inside a vehicle and of the street and wholesale value of cocaine in Puerto Rico. Agent Fernández explained why traffickers use couriers they know and trust, and how these couriers are typically compensated. He also described generally that traffickers use "test runs" of planned routes or deliveries, to check for law enforcement or other potential problems.

The government's questions on direct examination raised themes and factual circumstances similar to those in Agramonte's case, particularly the Agent's mention of "dry runs" and hidden vehicle compartments, and his specific estimation of the street

value of thirteen kilograms of cocaine.  However, Agent Fernández did not comment on Agramonte's specific charges, whether Agramonte knew or must have known about the cocaine in his van, or Agramonte's guilt.  On direct examination, Agent Fernández was not asked about Agramonte's case.  On cross-examination, Agent Fernández acknowledged that he had no relationship with Agramonte and had never met him.

### C.   Agramonte's Competency at Sentencing

#### 1.   Dr. Romey's Mental Health Evaluation

At a March 6, 2019, status conference, Agramonte's counsel informed the district court that "this case presents some mental health issues, which might not be sufficient to exclude my client's criminal liability" but would otherwise impact Agramonte's defense.

On July 10, 2019, Agramonte filed a mental health evaluation report dated March 12, 2019, prepared by clinical psychologist Dr. Carol Romey.  According to Dr. Romey's report, Agramonte scored extremely low for cognitive functioning, short term memory, and visual motor coordination skills and competencies.  Dr. Romey classified his I.Q. as "Extremely Low" and noted that Agramonte had limited understanding of risk and was at risk of being manipulated by others.  Dr. Romey diagnosed Agramonte with "Intellectual Disability, Mild" and concluded:

Regarding mental competency, Mr. William Agramonte is able to understand legal proceedings and collaborate with defense. He demonstrates serious short-term memory difficulties such that he will need to be advised in a repetitive manner, given simple instructions, and provided close monitoring of his comprehension.

## 2.   The Pretrial Matters Regarding Competency

On July 11, 2019, at a status conference before the district judge, defense counsel indicated that the defense might present two witnesses and it had already provided the government with a copy of Dr. Romey's report. On October 9, 2019, Agramonte filed a brief notice of intent to use evidence in connection with his mental condition, specifically to present the testimony of Dr. Romey.

At the October 11, 2019 pretrial conference, the government objected to Dr. Romey's potential testimony regarding Agramonte's mental condition. The government requested leave to obtain a summary of Dr. Romey's testimony and her curriculum vitae and indicated that it would seek to retain an expert for an independent evaluation of Agramonte. The defense responded that Dr. Romey would address Agramonte's diminished capacity and that Dr. Romey's expert report had been timely disclosed to the government. The district judge noted that the defense's October 9, 2019 notice of intent to use Dr. Romey's testimony did not comply with Federal Rule of Criminal Procedure 12 and had to be

re-filed with appropriate notice of the scope of her testimony and her curriculum vitae. The district judge ordered the defense to file this additional notice by October 16, 2019. Agramonte did not file any additional information concerning Dr. Romey and did not call Dr. Romey as a witness at trial.

### 3. Agramonte's PSR and Sentencing Memorandum

Before the sentencing hearing, the United States Office of Probation and Pretrial Services ("PO") prepared Agramonte's revised Presentence Investigation Report ("PSR"). In the PSR, the PO observed that Agramonte himself reported having low intelligence as a result of medical conditions he suffered as a child. Recounting Dr. Romey's assessment of Agramonte's "mild intellectual disability," the PO noted her finding that he is still able to understand legal proceedings and collaborate with the defense. The PO stated that Agramonte demonstrated serious short-term memory difficulties, needs to be advised in a repetitive manner and given simple instructions, and that his comprehension needed to be monitored. The PSR stated that Agramonte completed the fourth grade and is illiterate except for an ability to read several words. The PO cited Agramonte's "mild intellectual disability" as a potential basis for a discretionary variance pursuant to 18 U.S.C. § 3553(a).

In his sentencing memorandum, Agramonte requested a sentence of sixty months, below the one-hundred-twenty-month

mandatory minimum, citing his intellectual disabilities and personal characteristics and arguing for a diminished capacity departure under U.S.S.G. § 5K2.13. He also contended that a ten-year mandatory minimum sentence would be excessive and inconsistent with the § 3553(a) factors.

### 4. Agramonte's Sentencing

On February 27, 2020, Agramonte appeared before the district court for sentencing. At the outset of the hearing, defense counsel raised the issue of Agramonte's competency, informing the court:

> [T]his defendant just now . . . [told counsel] some things that showed me that he did not quite still grasp that he [] actually was found guilty, and that there is a mandatory minimum that applies. I explained all that to him. I explained the provisions of the safety valve numerous times to this defendant. Somehow I still get the feeling that he may, according to what he has told me, may not quite have grasped the consequences of his decision or indecision regarding these matters.

The district judge then engaged directly with Agramonte, asking him if he remembered meeting with the PO and discussing his PSR with counsel. Agramonte told the district judge "I needed a person that could explain to me, because I have never been in prison and I have never been in court. And I didn't know what a trial was. I needed someone to explain it to me." He went on to say "I wanted to plead guilty" and "I don't know what a sentence is."

This interchange prompted the district court to inquire further. After the district judge explained what a PSR is, and confirmed that Agramonte had reviewed his PSR with his lawyer, Agramonte reiterated that he did not "know really what is presentence, what is a trial, what is to plead guilty. I don't know." The judge then said:

> Okay. I saw your demeanor in the trial, because you were sitting right to my left in front of me. And it seems to me, as the witness testified, you were able to react and tell your attorney about things, what happened, what happened at the ferry. And you were following.
> So tell me if you - - if that is so, that you wanted to plead guilty from the beginning, why is it that you ended up in a trial?

Agramonte responded:

> I finished at a trial, because I saw it on TV, and that's what my mind told me to do.

The judge responded: "So you chose to follow a TV play than your counsel's advice? Is that what you're telling me?" Agramonte replied: "Yes." The judge remarked to Agramonte that she had to decide what his sentence will be "because there is a trial," at which point Agramonte interjected, "I am clear on that." At this point, the district court explained to Agramonte:

> The jury found you guilty of having engaged in an offense, which of course is a drug offense, possessing illegally with intent to distribute over 13 kilos of cocaine that were found concealed in the radiator of your van. And of course you know how you were arrested and everything that the witnesses for the

- 20 -

government said, because you sat here every single day of trial with an interpreter. And that's when I saw you reacting. And you saw all the pictures that were presented, all elements, everything that happened. And actually, I remember that when the government was talking about the prior time or occasion in which you were stopped in a van, I saw you reacting and talking to one of the three attorneys that were on the defense table. So it seems to me that you were following the evidence.

So be it as it may, I would like to know if there's anything you have to say here and that you would like me to consider before sentence is imposed?

In response, Agramonte allocuted before the district judge. Agramonte asked the judge to "take me to your consideration." Agramonte reiterated that he is illiterate and told the judge that he had not dared to speak earlier, although he wanted to. He said that he had been "confused of what [his] mind thought," and he had never been in a trial or in prison before.

Next, before the government presented its sentencing recommendation, it challenged the defense's characterization of Agramonte's disabilities, arguing that his successful completion of the multi-step process to take commercial trips between the Dominican Republic and Puerto Rico spoke to his "ability to comprehend what he was doing." The government suggested that Agramonte's renewed competency concerns were merely perpetuating "the arguments and the overlying theme of the defense . . . that

- 21 -

'my client was too naive or too gullible, or too . . . mentally disabled.'"

After hearing from the parties, the judge concluded:

> Because I have heard here about mental impairments, but actually, Dr. Romey found him competent, able to understand the legal proceedings and collaborate with the defense, which actually I saw during the trial. There's an indication that he could have short term memory difficulties, and that he needed to be advised in a repetitive manner. But aside from that, he was found completely competent. So the issue of competence was addressed, was taken care of by the defense on the record. And it seems that Dr. Romey's finding as well, when she says he's able to follow instructions. The jury found him guilty. Certainly his behavior during trial was I will say proper, consistent with instructions of counsel. That is so. He was able to receive advice from counsel. And at least there's that report on record. So I don't have any determination as to whether he has a definite diagnosis with an impairment that will have a name or a classification.

## III. Discussion

### A.  The Evidence of the December 10, 2018 Incident

Agramonte first contends the district court abused its discretion by admitting evidence of the factually similar December 10 canine alert, which took place eighteen days before the canine alert that prompted the drug search underlying the instant charges. He urges that the prior canine alert evidence should have been excluded under Federal Rules of Evidence 404(b) and 403 and because

the government violated discovery obligations with its delayed production of the canine training logs.

We review challenges to a court's rulings on delayed disclosure and to admit evidence pursuant Rules 404(b) and 403 for abuse of discretion. Clukey v. Town of Camden, 894 F.3d 25, 34 (1st Cir. 2018); United States v. Moon, 802 F.3d 135, 144 (1st Cir. 2015); United States v. Varoudakis, 233 F.3d 113, 118 (1st Cir. 2000); United States v. Josleyn, 99 F.3d 1182, 1196 (1st Cir. 1996). In evaluating the admission of "other-acts" evidence, "[w]e afford 'great deference to a district judge's balancing of probative value versus unfair prejudice.'" Moon, 802 F.3d at 144 (quoting United States v. Breton, 740 F.3d 1, 14 (1st Cir. 2014)).

### 1.  The Canine Evidence Discovery Delays

Citing Federal Rule of Criminal Procedure 16 and Josleyn, 99 F.3d at 1196, Agramonte challenges the admission of all canine alert evidence because of the government's delayed disclosure of the canine training logs for Honzo and Baku. On October 11, 2019, Agramonte requested access to the canine training logs and evaluations, but the government did not produce them until October 17, after the district court's October 16 deadline had passed. He urges that because "[i]nformation useful to impeach prosecution witnesses is material," the district court should have assessed "whether the defendant was denied the opportunity to use

- 23 -

the disclosed evidence effectively." See United States v. Osorio, 929 F.2d 753, 758 (1st Cir. 1991).

Citing United States v. Wicker, 848 F.2d 1059, 1061 (10th Cir. 1988), Agramonte asserts on appeal that if the district court had fully evaluated "whether or not the government acted in bad faith when it failed to comply with the discovery order; . . . the extent of prejudice to the defendant as a result of the government's delay; and . . . the feasibility of curing the prejudice with a continuance," it would have excluded the evidence or at least granted him a continuance to arrange for his own canine experts. Agramonte argues that he was prevented from meaningfully countering what he calls the government's "infallible dog's alert" theory at trial.

Agramonte's challenge fails for two reasons. First, "some showing of prejudice beyond mere assertion is required in the delayed disclosure context." United States v. Pérez-Ruiz, 353 F.3d 1, 8 (1st Cir. 2003) (citing United States v. Smith, 292 F.3d 90, 103 (1st Cir. 2002); United States v. Walsh, 75 F.3d 1, 8 (1st Cir. 1996)). Second, "a delayed disclosure only leads to the upsetting of a verdict when there is a reasonable probability that, had the evidence been disclosed" in a timely manner or the defense granted a continuance, "the result of the proceeding would have been different." Id. at 8-9 (citing United States v. Bagley, 473 U.S. 667, 678 (1985)). Agramonte relies on the Tenth Circuit's

- 24 -

three-part test instructing district courts to examine the government's reasons for the delay, the extent of any prejudice from the delay, and the feasibility of curing the prejudice with a continuance. See Wicker, 848 F.2d at 1061. We have never adopted Wicker, but without a showing of bad faith or prejudice from the delay, Agramonte's challenge fails even under the Tenth Circuit's standard.

Agramonte correctly cites Rule 16 as encouraging strict compliance with discovery obligations, however Rule 16 also empowers district judges to use their discretion in enforcing those obligations. We conclude that the district court did not abuse its discretion in finding a continuance was unwarranted, as the canine training logs and related certification letters amounted to only six pages and the government disclosed copies of Honzo's annual CBP certification on August 21, 2019 and Baku's annual CBP certification on October 4, 2019. See Pérez-Ruiz, 353 F.3d at 9 (upholding denial of a continuance where late-disclosed "records were neither voluminous nor arcane, . . . defense counsel had roughly thirty-six hours in which to scrutinize them before he brought the matter to the forefront," and defense counsel was offered the opportunity to extensively cross-examine the witness); Josleyn, 99 F.3d at 1196.

Agramonte submits that his ability to challenge the accuracy of Baku's December 10 alert was compromised without

earlier access to specific training records and that the government's late disclosure prevented the defense from obtaining its own canine expert. However, long before receiving the logs on October 17, 2019 Agramonte could have sought an expert once he knew that the government intended to introduce canine evidence at trial. Agramonte is correct that "a defendant must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses." Florida v. Harris, 568 U.S. 237, 247 (2013). But Harris does not require that defendants necessarily introduce their own competing experts on canine reliability, as Agramonte requested a continuance (in part) to do. There are multiple ways in which a defendant's opportunity to challenge canine evidence may be satisfied. Id. ("The defendant, for example, may contest the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty. So too, the defendant may examine how the dog (or handler) performed in the assessments made in those settings.").

When Agramonte cross-examined the CBP canine handlers at trial, he questioned them about the canines' training tests, records, and inspection history. In his closing argument, Agramonte again challenged the canines' accuracy and the handlers' testimony about "non-productive alerts," arguing that Baku's

December 10 alert was a false positive. The government objected to Agramonte's contention that the CBP handler called his dogs one hundred percent accurate, but the district court allowed the jury to consider Agramonte's characterization of the canine evidence. Agramonte has not met his burden to show how any delay in the government releasing the canine training records made his defense less effective.

### 2. The December 10th Incident as Rule 404(b) Evidence

Rule 404(b) governs the admissibility of "crimes, wrongs, or acts" other than those for which the defendant currently stands trial. Fed. R. Evid. 404(b). While such evidence is "not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," it "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Id.

We have explained that admission of "other-acts" evidence requires the trial judge to conduct an initial "two-step analysis," by first determining "whether the evidence has a 'special relevance' in that it is offered not to show a defendant's evil inclination but rather to establish some material fact." United States v. Tkhilaishvili, 926 F.3d 1, 15 (1st Cir. 2019) (quoting Veranda Beach Club Ltd. P'ship v. W. Sur. Co., 936 F.2d 1364, 1373 (1st Cir. 1991)). "If the trial court finds sufficient

relevance, the next step requires that it gauge probative weight against prejudicial effect," pursuant to Rule 403.  Id. (quoting Veranda Beach, 936 F.2d at 1373).

### a.    Rule 404(b) Special Relevance

Assuming that Rule 404(b) applies to evidence of the December 10 canine alert, the district court did not abuse its discretion in concluding that evidence of the December 10 incident had special relevance to the jury's understanding of the December 28 incident.  As the government explained in its notice of intent and at trial, evidence of the December 10 incident was admissible for multiple purposes under Rule 404(b): to show that Agramonte (1) had the opportunity and intent to hide narcotics in a custom-modified Ford Econoline, with the same "red flags" of non-factory welding marks, fresh paint, and an abnormally large radiator; (2) undertook preparations to conceal and transport cocaine via the same route; (3) had a common plan to use the radiator of a Ford Econoline van to hide cocaine; and (4) had knowledge that CBP officers were suspicious of his yellow van on December 10, regardless of the accuracy of the alert that triggered their unsuccessful attempts to remove the radiator.  The two events were highly factually similar, involving the same defendant, traveling exactly the same ferry border crossing route from the Dominican Republic to San Juan, under similarly last-minute arrangements only eighteen days apart.  See United States v. Raymond, 697 F.3d

- 28 -

32, 38 (1st Cir. 2012) (stating that in determining whether evidence has "special relevance to an issue in the case such as intent or knowledge," we consider "the timing of the proffered bad act and its degree of resemblance to the conduct charged in the case" (quoting Varoudakis, 233 F.3d at 118)).

Agramonte's knowledge of the cocaine found in his radiator was the pivotal issue in dispute at trial because Agramonte had posited the "blind mule" theory of defense, challenging the government to prove that he had the knowledge and intent to commit these crimes and was not an unsuspecting dupe of drug traffickers. The December 10 incident was highly probative in responding to the "blind mule" defense because the events were so similar that a jury who wished to acquit would have to conclude that Agramonte was duped not once but twice. The December 10 evidence was also relevant to the jury in assessing Agramonte's state of mind, preparation, plan, modus operandi, absence of mistake, or lack of accident.

Agramonte attempts to distinguish United States v. Agudelo, 988 F.2d 285 (1st Cir. 1993), and United States v. Rosario-Peralta, 199 F.3d 552, 562 (1st Cir. 1999), reasoning that "[i]n those cases, the canine alert was only part of the evidence offered to establish presence and possession of drugs regarding the charged crime." Agramonte submits that here, the canine alert was the "primary evidence" upon which the government asserted

- 29 -

knowledge and the presence of drugs, relying on impermissible propensity reasoning to do so. To the contrary, the narrative of the December 10 incident, which helped the government meet its burden as to Agramonte's knowledge, involved more than just the alert. The alert helped the jury to assess and make sense of the government's other evidence of Agramonte's knowledge, namely (1) the amount of cocaine found, which the government argued was far too valuable for a trafficking operation to hide in a stranger's car and would only be entrusted to someone who was in on the trafficking operation, and (2) the ferry protocols and setup, which the government presented to suggest that it would have been nearly impossible for someone to access Agramonte's van, modify the radiator, and stash drugs there without being detected.

Furthermore, the circumstances of the December 10 trip reflected similarities with Agramonte's December 28 trip aside from the canine alerts, namely comparable CBP "red flags." Both incidents involved similarly modified vans, with unusually large radiators, weld marks, and fresh paint, and last-minute arrangements to transport low value items that did not seem worth the travel costs. His change in vehicle, after his yellow van was flagged by CBP only shortly after he acquired it, suggests that Agramonte's participation on December 10 and December 28 was prearranged, indicating motive and a continuing plan.

To rebut Agramonte's contention that the drugs were planted in his van during the ferry ride, the government pointed to how Agramonte drove a similar van with the same modifications before to show that, although CBP did not find anything on December 10, the incident alerted Agramonte to law enforcement scrutiny and made his innocent victim explanation less likely. See United States v. Landry, 631 F.3d 597, 602 (1st Cir. 2011) ("This circuit, and others, have admitted evidence under Rule 404(b) to rebut a defense of innocent involvement."). The December 10 incident therefore had special, non-propensity relevance to help the jury assess Agramonte's knowledge, plan, absence of mistake, or lack of accident when CBP found drugs in his van on December 28.

In United States v. Centeno-González, we affirmed the district court's decision to admit Rule 404(b) evidence of a prior arrest involving concealed firearms because "knowledge and lack of mistake were directly at issue." 989 F.3d 36, 51 (1st Cir. 2021). At trial, the defendant claimed "that he did [not] know there was a hidden compartment that contained firearms and that someone else had hidden the firearms in the vehicle." Id. The government wanted "to show that [the defendant] engaged in a specific pattern of storing firearms in hidden vehicle compartments and, therefore, would have likely been aware that there was a firearm hidden" in the car he was driving. Id. We found the Rule 404(b) requirements satisfied because "evidence relating to [defendant]'s prior

- 31 -

conviction went directly to the question of his knowledge or lack of mistake rather than to his propensity toward criminal activity." Id. We further found that the prior conviction was not unfairly prejudicial because the government's witness was subject to cross-examination about the prior event, "defense counsel was given the opportunity to argue that the prior [incident] was not, in fact, probative of [defendant]'s knowledge," and "[t]he government's closing illustrate[d] that it utilized the bad act evidence in tight keeping with the special relevance upon which it had been admitted." Id.

We reach the same conclusion here. The government reminded the jury in its closing argument that the December 10 alert was not evidence of a crime in itself, but "a tool" to evaluate whether the fruitful CBP search was due to mistake or accident and assess whether Agramonte was a blind mule or knew drugs were hidden in his van radiator on December 28.

### b. Rule 403 Unfair Prejudice

Finally, the challenged "other-acts" testimony survives Rule 403 balancing. We have cautioned that "even when initially consistent with Rule 404(b), prior bad act evidence may become troublesome if the evidence itself is unfairly prejudicial or if it is admitted in excess or misused by the government over the course of the trial." Centeno-González, 989 F.3d at 51. We have

explained that "[t]here is clearly a tension between Rules 404(b) and 403," Varoudakis, 233 F.3d at 123, as:

> The more similar the prior bad act evidence is to the charged crime, the more likely it is to be deemed relevant under 404(b).  Yet the more the prior bad act resembles the crime, the more likely it is that the jury will infer that a defendant who committed the prior bad act would be likely to commit the crime charged.  See United States v. Beechum, 582 F.2d 898, 915 n.20 (5th Cir. 1978) ("the more closely the extrinsic offense resembles the charged offense, the greater the prejudice to the defendant").  This is precisely the kind of inference that Rule 403 guards against.  See [United States v. Lynn, 856 F.2d 430, 436 (1st Cir. 1988)] ("The ordinary inference here would seem very close to the inference the Rule was designed to avoid.").

Id.

Here, the district court found on the record that this evidence was not unfairly prejudicial.  In doing so, the court carefully instructed the parties that evidence of the December 10th incident "will not go beyond indicating that the K-9 alerted positive consistent with its training and the results of any secondary inspection by law enforcement agents was negative."  The district court need not have elaborated on its Rule 403 balancing. See García-Sierra, 994 F.3d at 32 ("Although the court did not do so explicitly, the record indicates that the court performed the requisite [Rule 403] balancing implicitly.") (citing Breton, 740 F.3d at 15 ("[T]he absence of an express Rule 403 finding . . .

- 33 -

does not mean the district judge failed to perform this analysis.")).

The district court did not abuse its discretion in concluding that any risk of unfair prejudice from the December 10 alert did not substantially outweigh its high probative value due to its factual similarity to the December 28 incident and the government's need for evidence of Agramonte's knowledge. For example, the December 10 incident is distinguishable from the prior drug-smuggling activity deemed admitted in (harmless) error in García-Sierra. There, we reasoned that the other-acts evidence was "not straightforwardly connected to" the defendant, its "permitted use . . . was much less natural and intuitive than the forbidden propensity use, adding to the danger of unfair prejudice," and "this prejudice and confusion was not mitigated by the instructions provided to the jury." García-Sierra, 994 F.3d at 32-34.

We have repeatedly emphasized the jury impact of the government's closing characterization of "other-acts" evidence and the related mitigating effect of a Rule 404(b) limiting instruction. See id.; United States v. Santana, 342 F.3d 60, 67 (1st Cir. 2003) (finding that, although evidence of earlier drug dealing was separated by a significant length of time and "was prejudicial to [defendant,] it was not an abuse of discretion . . . to find that the prejudice did not substantially outweigh the

testimony's probative value" given the significant factual similarity to the charged crime and the trial court's careful limiting instruction); United States v. Arias-Montoya, 967 F.2d 708, 714 (1st Cir. 1992) (stating that it was harmless error for the district court to have admitted defendant's prior conviction because of "the strength of the government's case without the bad act evidence," the prosecutor's failure to reference the prior bad act during the remainder of trial or in his closing, and the district court's instruction that the jury should limit the weight given to the prior conviction); see also United States v. Henry, 848 F.3d 1, 10 (1st Cir. 2017) ("Moreover, although the similarity between Henry's prior drug conviction and the charged drug crime presents a risk that the jury might draw an impermissible inference of propensity, the court addressed that risk with a limiting instruction.").

Here, the government's characterization of the December 10 incident in its opening and closing arguments was consistent with its notice of intent to use evidence of the prior canine alert pursuant to Rule 404(b) to (1) counter Agramonte's anticipated defense that he was unaware that cocaine was hidden in his van on December 28, and (2) show a continuing plan and a motive to switch vehicles to avoid law enforcement suspicion.

Agramonte is correct that the degree of similarity between the canine alerts increased the related risk of propensity

reasoning. See United States v. DeCicco, 370 F.3d 206, 213 (1st Cir. 2004) ("[T]here is always some danger that the jury will use [Rule 404(b) other act] evidence not on the narrow point for which it is offered but rather to infer that a defendant has a propensity towards criminal behavior." (alterations in DeCicco) (quoting United States v. Trenkler, 61 F.3d 45, 56 (1st Cir. 1995))). Agramonte fails, however, to show "unfairness sufficient to counteract [the] substantial probative value" of the December 10 alert, particularly as the district court limited the scope of the evidence to testimony that the canine alerted but that no drugs were found and the district judge delivered a 404(b) limiting instruction. Raymond, 697 F.3d at 39; see United States v. Owens, 167 F.3d 739, 756 ("[O]ur system of trial by jury is premised on the assumption that jurors will scrupulously follow the court's instructions . . . .").

The district court did not abuse its discretion in admitting testimony regarding the December 10 incident. The testimony recounting the December 10 alert fell squarely within both "foundational requirements for Rule 404(b) evidence." Raymond, 697 F.3d at 38 (stating that 404(b) evidence must have "special relevance" and also "pass through the filter of Federal Rule of Evidence 403"). Here, "the proffered evidence was specially relevant" as the defendant maintained that his conduct was accidental or unknowing and "the evidence tended to show the

absence of mistake." Id. (upholding admission of a prior bad act as "the testimony was not introduced to prove that the defendant was a predator but, rather, to shed light upon his intent" when he committed the acts charged). The special relevance of the December 10 canine alert is bolstered by the fact that "the events chronicled in the challenged testimony were not only proximate in time, but also bore a strong resemblance to the charged conduct." Id. at 38-39. Furthermore, it was within the district court's discretion to find that the probative value of the prior alert was not substantially outweighed by any unfair prejudice, and to allow the evidence in despite minor discovery delays.

**B.    The Testimony of Agent Fernández**

Agramonte next argues that HSI Agent Yuany Fernández's testimony, offered at the close of the government's case regarding how drug trafficking organizations operate in Puerto Rico, how they smuggle drugs across the border, and how they choose couriers that they know and trust, was inadmissible law enforcement "overview" testimony. He claims the district court abused its discretion by admitting this testimony, which he deems the only "other indirect evidence of knowledge" aside from the December 10 canine alert. Agramonte cites cases in which we viewed overview testimony as problematic. See United States v. Rodríguez, 525 F.3d 85, 95 (1st Cir. 2008); United States v. García-Morales, 382 F.3d 12, 16 (1st Cir. 2004); United States v. Casas, 356 F.3d 104,

119-20 (1st Cir. 2004). We find these cases inapplicable because Agent Fernández's testimony was not "overview" testimony.

### 1. Law Enforcement Testimony as Overview Testimony

"Overview testimony refers to the use of a witness to 'map out [the government's] case and to describe the role played by individual defendants.'" United States v. Pérez-Vásquez, 6 F.4th 180, 199 (1st Cir. 2021) (alteration in Pérez-Vásquez) (quoting United States v. Flores-de-Jesús, 569 F.3d 8, 16 (1st Cir. 2009)). "Such testimony is improper because it may describe evidence that never materializes and, if the witness is a government agent, may lend the imprimatur of government to a later-testifying witness." Id.

"Testimony by a law enforcement agent constitutes impermissible 'overview' testimony when it effectively opines that a defendant is guilty 'based on the totality of information gathered' in the agent's investigation, rather than relaying the agent's first-hand experiences and observations." García-Sierra, 994 F.3d at 26 (quoting United States v. Meises, 645 F.3d 5, 15 (1st Cir. 2011)). "[H]aving [an agent] so testify amount[s] to simply dressing up argument as evidence." Id. at 27 (alterations in García-Sierra) (quoting Meises, 645 F.3d at 17). Also, "to the extent such testimony is a 'preview of other witnesses' testimony,' it functions as an endorsement by the government of the first-hand witness's account, thereby impermissibly bolstering that witness's

credibility." Id. (quoting Meises, 645 F.3d at 17). "While there is no 'blanket ban on all overview testimony,'" United States v. Reyes, 24 F.4th 1, 22 (1st Cir. 2022) (quoting United States v. Etienne, 772 F.3d 907, 914 (1st Cir. 2014)), "such testimony is '[d]isfavored' in the drug conspiracy context where a law enforcement agent 'based on the results of the agency's overall investigation, rather than on his own personal knowledge or participation' 'testif[ies] about a defendant's specific role in [a] charged conspiracy,'" id. (alterations in Reyes) (quoting Etienne, 772 F.3d at 913-14).

Agent Fernández's testimony meets none of the criteria for problematic overview testimony. First, his testimony came at the end, not the beginning, of trial and did not anticipate later testimony. Second, Agent Fernández did not "map out" the government's case or "dress up" the government's argument as evidence. To the contrary, as Agramonte's counsel revealed on cross-examination, Agent Fernández had no personal knowledge of the facts in Agramonte's case and the government never proffered him as a witness with such knowledge.

Third, as Agent Fernández was not aware of and did not testify about the government's investigation in this case, it follows that he did not bolster other witnesses' testimony. In fact, Agent Fernández admitted that he became aware that he would be a witness in the Agramonte trial only one week before the trial

itself and, before that time, he had no participation in the Agramonte case at all. Fourth, Agent Fernández did not testify about what other law enforcement agents knew about the Agramonte investigation. Agent Fernández confirmed on cross-examination that, although he had testified on direct examination about controlled deliveries and the use of informants, he was not aware of any controlled deliveries or informants in Agramonte's case. Instead, Agent Fernández testified about his general personal knowledge as a law enforcement officer of the drug trade in Puerto Rico, without reference to the specifics in Agramonte's case.

Finally, consistent with the district court's October 18, 2019 ruling, Agent Fernández was not qualified as an expert witness, and during jury instructions, the district judge limited the expert witness instruction to Charlotte Castro, a chemist, who testified that the specimen she analyzed was powder cocaine.

### 2. Law Enforcement Testimony as Lay Testimony

Rather than an objection to overview testimony, it may be that Agramonte's real challenge is to Agent Fernández's testimony as a lay witness under Federal Rule of Evidence 701. In his brief, Agramonte refers to Rule 701's limitations on the testimony of lay witnesses and argues that, because Agent Fernández was testifying as a lay, not expert, witness his testimony should have been limited to opinions "(a) rationally based on [his] perception; (b) helpful to clearly understanding the witness's

testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

However, "we have previously upheld the admission of similar lay opinion testimony about drug distribution practices based on law enforcement experience." United States v. Norris, 21 F.4th 188, 198 (1st Cir. 2021) (citing Moon, 802 F.3d at 147-48; United States v. Valdivia, 680 F.3d 33, 50-51 (1st Cir. 2012); United States v. Ayala-Pizarro, 407 F.3d 25, 29 (1st Cir. 2005)). "[W]e have long held that government witnesses with experience in drug investigations may explain the drug trade and translate coded language for juries, either through lay or, if qualified, expert testimony." United States v. Rosado-Pérez, 605 F.3d 48, 56 (1st Cir. 2010). "Indeed, time and again we have stated that Rule 701 lets in testimony based on the lay expertise a witness personally acquires through experience, often on the job." United States v. Belanger, 890 F.3d 13, 25 (1st Cir. 2018) (cleaned up); see also United States v. Amador-Huggins, 799 F.3d 124, 130 (1st Cir. 2015) (finding no abuse of discretion in a district court's ruling that a law-enforcement witness presented only lay testimony in accordance with Rule 701 when the knowledge underpinning his testimony "was 'rationally based on the witness's perception,' acquired in the course of his work as an FBI agent"); United States v. Habibi, 783 F.3d 1, 5 (1st Cir. 2015) (concluding it was not an

abuse of discretion to permit an agent to offer lay testimony when the testimony was based on the agent's "experience as a federal law enforcement officer").

Based on our precedent, Agent Fernández's testimony satisfied Rule 701's requirement that lay opinion evidence be "helpful to clearly understanding the witness's testimony or to determining a fact in issue." Fed. R. Evid. 701(b). The jury was likely unfamiliar with the patterns and practices of drug traffickers, particularly how they choose specific couriers and smuggling routes. This context was particularly helpful here for the jury to assess the defense's theory that Agramonte was an unknowing "blind mule" as opposed to a trusted deliveryman who knew about the cocaine hidden in his van radiator. See Habibi, 783 F.3d at 5 (concluding there was no abuse of discretion in admitting a law-enforcement lay witness's testimony when it was grounded in his investigative experiences as an FBI agent and, "though anecdotal," ultimately "'helpful' to the jury"); Meises, 645 F.3d at 16 ("The nub of [Rule 701(b)'s] requirement is to exclude testimony where the witness is no better suited than the jury to make the judgment at issue, providing assurance[ ] against the admission of opinions which would merely tell the jury what result to reach." (citations and internal quotation marks omitted, second alteration in original)).

Agent Fernández's testimony was based on his on-the-job experiences in law enforcement, as described when the proper foundation was laid for his testimony. Before sharing his observations with the jury, Agent Fernández set out his eighteen years of border patrol and law enforcement work experience, his training in the narcotics field, and his current role overseeing all of HSI's undercover operations in Puerto Rico. See Rosado-Pérez, 605 F.3d at 56. Agent Fernández was questioned about his credentials and cross-examined by defense counsel, which mitigated any risk of unfair prejudice. The district court did not abuse its discretion in allowing Agent Fernández to testify.

## C. Agramonte's Competency at Sentencing

Agramonte's final challenge is that the district court abused its discretion in failing to sua sponte order a competency hearing prior to or during his February 27, 2020 sentencing hearing. We have explained that a "district court must have a hearing 'if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature of the proceedings against him or to assist properly in his defense.'" United States v. Gonzalez-Ramirez, 561 F.3d 22, 28 (1st Cir. 2009) (quoting 18 U.S.C. § 4241(a)). "We . . . review the district court's decision not to hold a competency hearing for abuse of discretion." United

States v. Kenney, 756 F.3d 36, 43 (1st Cir. 2014). "We will affirm so long as there was a sufficient evidentiary basis to support the decision." Gonzalez-Ramirez, 561 F.3d at 28 (citing United States v. Bruck, 152 F.3d 40, 46 (1st Cir. 1998)).

Agramonte observes that concerns regarding his competency at the sentencing hearing were serious enough to prompt the district court to engage him in a series of questions, and he further contends that his responses "showed that he did not understand the [sentencing proceedings or the safety valve provision] and that he was not making reasonable decisions." Agramonte maintains that the district court erred in not affording "significant weight" to the competency concerns that his counsel raised before trial and renewed at the sentencing hearing. We disagree and conclude that the district court did not abuse its discretion in failing to sua sponte order a competency hearing before proceeding with Agramonte's sentencing. See United States v. Malmstrom, 967 F.3d 1, 7 (1st Cir. 2020).

The district judge did not view Agramonte in a vacuum by the time Agramonte arrived at the sentencing hearing. First, the district judge reviewed Dr. Romey's March 12, 2019 report and her conclusion that, although Agramonte presented some mental capacity challenges, he was "able to understand legal proceedings and collaborate with defense." Given the nature of Agramonte's mental impairment, nothing in the record suggests that his baseline

- 44 -

cognitive functioning would have changed from March 11, 2019, when Dr. Romey examined him, to February 27, 2020, the date of the sentencing hearing.

Second, neither defense counsel nor the government had requested the district judge to hold a competency hearing during the period from Agramonte's indictment to the sentencing hearing.

Third, there was nothing about Agramonte's crimes that implied a diminished mental capacity. He had procured a Ford Econoline van in November 2018, had engaged in international travel to the Dominican Republic, had returned to Puerto Rico in early December 2018, had purchased another Ford Econoline van, had again traveled to the Dominican Republic that same month, had the van modified for transportation of illegal drugs, and had traveled back to Puerto Rico. Although perhaps not the most sophisticated drug-smuggling operation, there was nothing about the crimes or his role in them that suggested mental incompetence.

Fourth, although Agramonte had indicated he might raise his mental incapacity as a defense during trial, including by calling Dr. Romey as an expert witness, he did not re-file appropriate notice of her proposed testimony as ordered by the district court and never presented the issue of his mental incapacity to the jury.

Fifth, the district judge had presided over Agramonte's jury trial and had the advantage of watching him closely

throughout, assessing his reactions to the evidence and arguments and his interactions with counsel.

Sixth, although the PO confirmed Agramonte's mental capacity limitations and suggested that the district court could take them into account in imposing a variant sentence, the PO did not suggest that the district judge depart downward under U.S.S.G. § 5H1.3 on this basis.

Seventh, once alerted at the outset of the sentencing hearing to defense counsel's concerns about Agramonte's mental capacity, the district judge did not dismiss the concerns; rather, the district judge engaged with Agramonte and his counsel regarding his competency. Following a colloquy with Agramonte prompted by his counsel's comments, the district judge concluded that defense counsel could provide the reminders and advice recommended by the psychologist, who the district judge noted had otherwise found him "completely competent."

Eighth, Agramonte's counsel framed the competency concerns primarily in terms of an asserted unfairness in the mandatory minimum sentence as applied to someone with Agramonte's mental limitations.

Ninth, when Agramonte allocuted at his sentencing hearing, his statements to the district judge were appropriate and did not signal his incompetency. Agramonte urged the judge to take him into her consideration. He then reminded the judge that

he was illiterate, did not know about words and letters, did not know what he was doing in court, and that he had never been in a trial and never been in prison. Although Agramonte's statements were consistent with his intellectual limitations, his allocution would not otherwise have alerted the sentencing judge that there were additional competency concerns.

Tenth, after Agramonte allocuted, the government addressed his culpability by arguing in part that, regardless of his mental limitations and limited education, the trial testimony demonstrated that Agramonte had conducted a fairly complex operation, importing and exporting goods from the Dominican Republic for an alleged profit. The government pointed out that Agramonte's supposed business involved more sophistication than merely purchasing a ferry ticket; he was also required to have travel and vehicle documentation, complete bills of lading, and meet deadlines on pain of fine. In the past, the government argued, Agramonte had navigated these requirements. In response to the government's argument, defense counsel informed the district judge that Agramonte wanted the judge to know that, "as regards to the documents that were completed, he would ask somebody else to sign them or prepare them for him as a favor given his limitations."

We have reiterated that the "bedrock principle" of competency is that "a defendant must possess the ability to

communicate with his counsel so that he can assist meaningfully in the preparation and presentation of his defense." Malmstrom, 967 F.3d at 5 (citing Kenney, 756 F.3d at 43; 18 U.S.C. § 4241(a)). This is a "functional concept." Id.

While Agramonte's mental health evaluation, his behavior at the trial, and his allocution at sentencing all support his competency, the above exchange is also convincing. It shows that, at the very hearing at issue, he was actively assisting in his defense by registering arguments from the government and offering information that would serve as rebuttal.

Finally, as we have observed, concerns about mental health are "endemic to the criminal justice system." Kenney, 756 F.3d at 44. A defendant may have a serious mental health condition "while still being able to understand the proceedings and rationally assist his counsel." Id. (quoting United States v. Widi, 684 F.3d 216, 221 (1st Cir. 2012)).

Here, the district court properly based its competency decision on the psychological assessment submitted by the defense, the inaction of counsel in failing to request a competency hearing, and its own observations of Agramonte during the full course of the case. True, the evidence here could suggest that Agramonte did not or could not understand what was going on, particularly his peculiar reference to his decision to go to trial because of what he saw on television. But the district judge, who had

presided over his trial and was present at his sentencing hearing, could reasonably conclude that Agramonte was sufficiently competent to proceed with sentencing without any need for a competency hearing. See Gonzalez-Ramirez, 561 F.3d at 28 (instructing that the district court's decision on this score should be affirmed if there was a sufficient evidentiary basis for it).

It follows that the district court did not abuse its discretion in failing to find "reasonable cause to believe that a substantial question exist[ed] concerning defendant's competency" requiring intervention. Malmstrom, 967 F.3d at 7 (noting that although defendant's "offense conduct raises a legitimate question about his overall mental health," the fact that the defendant struggles with mental health issues "is not a per se bar to a finding of competency to stand trial"); see also Widi, 684 F.3d at 221.

## IV. Conclusion

This case involved some troubling facts and posed a series of difficult questions, but our caselaw, which we are dutybound to follow, compels that the defendant's convictions and sentence must be affirmed.