Filed 2/20/24

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GEORGE THOMAS ROUSTON, JR.,<br><br>    Defendant and Appellant. | D080114<br><br><br><br>(Super. Ct. No. SCD287842) |

APPEAL from a judgment of the Superior Court of San Diego County, Jeffrey F. Fraser, Judge.  Reversed and remanded for a new trial.

Mary McComb, State Public Defender, and Jessie Hawk, Senior Deputy State Public Defender, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted George Thomas Rouston, Jr. of premeditated attempted murder (Pen. Code, §§ 187, 189, 664; count 1[1]), conspiracy to commit murder (§ 182, subd. (a)(1); count 2), and shooting at an occupied vehicle (§ 246; count 3). The jury also found true several gang and firearm enhancements. The trial court sentenced Rouston to 50 years to life in state prison. Rouston's convictions stemmed from a gang-related drive-by shooting that occurred in the midst of a gang war between Rouston's gang, the Logan Heights Red Steps, and its rival Sherman Heights. The prosecution alleged that Rouston was the passenger in a car driven by another gang member, Issic Navarro, and that Rouston and Navarro both opened fire on the victim in his car, hitting him in the face with one bullet.

On appeal from the judgment of conviction, Rouston alleges multiple claims of error. He asserts the trial court erred by failing to exclude the improper opinion testimony of the lead detective in the case, who was permitted to opine on the most fundamental disputed issue of the case: whether Rouston fired a gun. Rouston also asserts this opinion and others the detective espoused at trial were based on subject matter in which the detective had no expertise or training. In addition, Rouston contends the trial court erred (1) by allowing a video of hearsay statements from an eyewitness that took place minutes after the shooting; (2) by allowing the interviewing police officer to testify about the same witness's out-of-court hand gestures; (3) by erroneously instructing the jury on the concept of implied malice; (4) by misstating the law with respect to the personal discharge of a firearm enhancement; (5) by failing to exercise its discretion under newly enacted sentencing reforms; and (6) by improperly imposing certain firearm enhancements on the charge of shooting at an occupied

---

[1] Subsequent undesignated statutory references are to the Penal Code.

vehicle.  Finally, Rouston asserts that reforms made by Assembly Bill No. 333 require reversal of the gang enhancements and the gang-related firearm enhancements.

As we shall explain, we agree with Rouston that the trial court prejudicially erred by allowing the lead detective to opine that Rouston fired the bullet that struck the victim, and that this error infected the jury's verdict for each of the three crimes of which Rouston was convicted, requiring reversal of the judgment.  Accordingly, we do not reach the other claims of error asserted by Rouston.  The judgment of conviction is reversed and the cause is remanded for a new trial.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Prosecution's Case*

According to the parties' stipulation at trial, the Sherman Heights and Logan Heights Red Steps are criminal street gangs under the law as amended by the STEP Forward Act of 2021.  The gangs are rivals and they claim adjacent San Diego neighborhoods as their territories.  The parties stipulated that on October 22, 2020, Sherman Heights gang member J.O. was shot and killed in National City.  The next day, in apparent retaliation, a 15-year-old Logan Heights gang member, B.R., was shot and killed in the adjacent neighborhood of Barrio Logan.

At the time of the shootings, Rouston was a long-time member of the Logan Heights gang.  Rouston was with B.R. when he was shot.  When the police arrived on the scene of B.R.'s shooting, B.R. was in Rouston's car and Rouston was planning to take B.R. to the hospital.  Rouston was visibly upset over B.R.'s death.  After B.R.'s death and the subsequent shooting at issue here, investigators found a vigil at Rouston's home that displayed, among

3

other things, a hat bearing B.R.'s gang moniker  and a shirt bearing B.R.'s image and the words "Rest in Peace."

In midafternoon the day after B.R.'s death, Sherman Heights gang member O.Z. went to Grant Hill Park, where he and other Sherman Heights gang members gathered in remembrance of J.O.  When the gathering finished, the Sherman Heights gang members left the park, and O.Z. went home.  Later that afternoon, Navarro was seen at the memorial for J.O. kicking over candles that had been lit at the gathering, which stained his jeans and shoes with candlewax.

Around 5:00 p.m. that day, Navarro and Rouston drove to O.Z.'s residence in a white Ford sedan owned by another Logan Heights gang member.  A witness observed a white sedan slowly drive past O.Z.'s house. O.Z. then emerged from his house and got into his blue Honda Civic parked in the street.  The white car then turned back around and pulled up alongside O.Z.  With the two vehicles facing opposite directions so that their driver's side doors were adjacent, shots were fired from the Ford at O.Z. in the Honda.

One bullet hit O.Z. squarely in the face—the bullet was to "the right portion of [O.Z.'s] nose" and "almost destroyed his face [and] part of his mouth."  O.Z.'s car then rolled forward and hit a car parked in front of it.  The police arrived shortly after the shooting to find O.Z. sitting outside, "bleeding profusely" from the gunshot wound to his face, with his mother holding a towel to his head.  Paramedics arrived and took O.Z. to the hospital.  The inside of O.Z.'s vehicle contained blood, bone, and facial tissue.  The bullet itself was found lodged in O.Z.'s neck.

Three witnesses to the shooting testified at trial.  P.C. lived on the street where the shooting occurred and was returning home with her boyfriend, I.L., at that time.  She had just exited I.L.'s truck when she saw

4

the white sedan slowly drive by O.Z.'s house. As she was moving her trash cans from the street to make room to park, she saw O.Z. exit his house and get into his car. She then saw the white sedan again and heard the gunshots.

On the witness stand, P.C. gave conflicting testimony about the shooting. Initially, she testified that she did not see who was in the car, then she stated she remembered telling a police officer there were two individuals in the white car and that they wore blue hats with a white "SD" logo. P.C. did not remember telling the officer that both men were holding guns. Eventually, she recanted and testified she did remember telling the officer she saw two men in the car and both were holding guns.

After P.C. left the stand, the prosecution showed the jury a video of the interview of P.C. that was recorded by the body-worn camera of the interviewing police officer 10 minutes after the shooting. During the interview, P.C. told the officer that there were two men in the car, and that both fired guns out of the driver's window.[2]

During his testimony, P.C.'s boyfriend I.L. stated he could not remember anything about the shooters. Another officer at the scene who interviewed I.L. testified that I.L. told him he saw two men in a white sedan and that the driver had a black, glock-style handgun in his right hand.

Another neighbor, A.C., was also nearby before the shooting. During his testimony, A.C. stated that he said "hi" to O.Z. before O.Z. got into his car. When the shooting began moments later, A.C. ducked behind another car. After the shooting ended, A.C. ran to help O.Z. and used a shirt to help stop the bleeding. A.C. stayed with O.Z. for a few minutes until more help

---

[2]    The interviewing officer also testified. He told the jury that P.C. made physical gestures about the shooters' positions that he interpreted to mean the passenger was holding his gun with his right hand and firing across the driver's face out the driver-side window of the car.

arrived. A.C. testified he did not recall talking to a police officer after the shooting or telling the police he saw a white sedan. A.C.'s testimony was impeached by an investigator assigned to the District Attorney's gang prosecution unit who drove A.C. home from court the day he testified. The investigator stated that during the car ride, A.C. volunteered that both passengers in the white sedan fired at O.Z.

In addition to the witnesses, a driver in the area had a dashboard camera ("dashcam") that was recording at the time and captured audio of the gunfire. On the recording, one gunshot, then a pause of several seconds, and then seven additional gunshots in rapid succession are audible.

Soon after the shooting, the police located the white Ford and engaged in a high-speed pursuit. During the chase, Navarro stopped, discarded a grey "Ruger" handgun on the street, and dropped off Rouston. Video taken by a surveillance camera at an apartment complex near where Rouston was dropped off showed the Ruger lying on the ground, and showed Rouston was picked up by a black SUV shortly after getting out of the Ford.

After dropping off Rouston, Navarro continued his flight, then crashed the Ford sedan and was apprehended by police. Rouston was arrested a little over two weeks later. Inside the Ford sedan, the police found a full 9-millimeter handgun magazine and candlewax matching the candles Navarro kicked over at the candlelight vigil earlier that day. The police also recovered a black "ghost gun"—a weapon without a serial number or registration—on the ground near the path of the police chase of the Ford.

Investigators found that the ghost gun was inoperable because a shell casing was stuck in the gun's ejection port, jamming it. The gun could not be fired again unless it was manually cleared. Investigators determined the Ruger handgun had fired seven shots at O.Z.'s vehicle, in the process

6

expending six shell casings onto the street about 10 to 15 feet away from O.Z.'s car, and one onto the floorboard of the white sedan.[3] Four of the bullets hit the exterior of O.Z.'s car on the driver side and a fifth hit the car that O.Z.'s car rolled into. The Ruger had eight rounds remaining in the 15-round magazine inserted in it, consistent with seven shots having been fired.

Both guns were tested for DNA. At trial, the criminalist who performed the tests stated the swabs taken from the Ruger showed the DNA of several contributors, including Navarro, and that he found limited support to exclude Rouston as a contributor. The tests showed that Navarro was the primary contributor of DNA on the swab taken from the gun's trigger. The DNA testing on the ghost gun was less conclusive. Because there were more than five contributors of DNA on two of three swabs taken from the gun, the lab was unable to test those two swabs. The tests of the third swab showed five DNA contributors, including Navarro and another Logan Heights gang member, but not Rouston.

As we set forth in more detail below, the prosecution's key witness in the case was the lead investigator for the shooting, Detective Kevin Jankowski. Jankowski took the stand five separate times over the four-day trial, and served as the prosecution's gang expert.[4] He described his investigation and told the jury, over the defense's objection, that based on his own experience and other witnesses' testimony he believed Rouston fired the

---

[3] Forensics testing showed the six expended shell casings at the scene of the shooting were from the Ruger, as was the one casing found inside the white sedan.

[4] The reporter's master chronological index shows Jankowski was on the stand a total of seven times, but on the first day of trial his testimony was interrupted three times to allow other prosecution witnesses to go out of turn before Jankowski's initial testimony was completed.

ghost gun, and the bullet fired by Rouston struck O.Z. in the face. Jankowski also opined that the shooting was committed for the benefit of Rouston and Navarro's gang and in retaliation for the shooting of B.R. the day before. In addition, Jankowski was called to the stand several times to summarize or opine on the testimony of other prosecution witnesses, including P.C.'s observations of the shooting, the driver of the car whose dashcam video recorded the gunshots, a police officer who recovered the jammed ghost gun from the area it was dropped, and a firearm training officer employed by the police department.

B. *Defense Case*

The defense called no witnesses. Because the prosecution suggested that the passenger of the white sedan fired the gun with his right hand, the defense presented a stipulation that Rouston writes with his left hand. The defense theory of the case was that even if Rouston was the passenger, he did not fire a gun and had no knowledge of, or intent to assist, Navarro's plan to kill O.Z.

C. *Verdict and Sentencing*

After five and a half hours of deliberations, the jury reached its verdict finding Rouston guilty of attempted premeditated murder (§§ 187, 189, 664; count 1); conspiracy to commit murder (§ 182, subd. (a)(1); count 2); and shooting at an occupied vehicle (§ 246; count 3). The jury also found all of the charged enhancements true: the gang enhancement allegations attached to each count (§ 186.22, subd. (b)(1), (4), and (5)); the personal use and intentional discharge of firearm allegations attached to each count (§ 12022.53, subds. (b), (c)); and the discharge of a firearm causing great

8

bodily injury in the commission of an offense committed to benefit a criminal street gang attached to each count (§ 12022.53, subds. (c), (d), (e)(1)).

At the sentencing hearing, the trial court sentenced Rouston to 25 years to life for conspiracy to commit murder, and to a consecutive 25 years to life on the vicarious gang-related firearm enhancement under section 12022.53, subdivisions (d) and (e)(1). The court stayed sentences on all other charges and enhancements. Rouston filed a timely notice of appeal from the judgment.

## DISCUSSION

Rouston's primary argument on appeal is that the trial court erred by allowing Jankowski's improper opinion testimony. In support, he makes three main claims. First, Rouston asserts that Jankowski's opinion that he fired the ghost gun first, striking O.Z., was improper because Jankowski was not qualified to render such an opinion. Next, he argues that this "expert" opinion was also "logically and factually unsupported," and thus should have been excluded. Finally, Rouston contends Jankowski's testimony that Rouston, and not Navarro, fired the bullet that struck O.Z., which Jankowski explicitly stated was based on the testimony of other witnesses, was improper because it usurped the jury's role. Rouston argues this improper testimony by Jankowski was prejudicial to his defense and requires reversal.

In response, the Attorney General asserts that Rouston forfeited some of these issues by failing to object to Jankowski's testimony in the trial court. The Attorney General also argues that Jankowski's opinions were not impermissibly speculative and were a proper subject for expert testimony. Alternatively, the Attorney General argues that any error with respect to Jankowski's testimony was harmless.

# I

## *Additional Background*

Before trial, Rouston submitted several motions in limine. Included was a motion to exclude witnesses from offering any express or implied opinion on Rouston's guilt. The motion was not opposed and the trial court granted it. In addition, the court granted a defense motion to preserve issues for appeal that were raised in limine. During the same pretrial conference, the prosecution designated Jankowski as the investigating officer for trial. Thereafter, the court allowed Jankowski to sit at the prosecutor's counsel table and observe the entire trial.

When he took the stand as the prosecution's first witness, Jankowski testified that he had been a police officer for 15 years. He testified to his experience and training regarding gangs, and his role at the time of the shooting in this case as a member of the police department's street gang unit and the detective designated to the gangs that were involved. His second time on the stand, after the prosecutor asked him how many gunshots he heard on the dashcam video that recorded the shooting, Jankowski testified to his experience in firing guns. He stated that he had attended required firearm trainings multiple times each year during his career and also regularly visited firearm ranges for general practice.

On the second day of trial, the prosecutor called Jankowski to the stand following the testimony of the driver whose dashcam recorded the shooting. Jankowski testified that he had watched the video probably two dozen times, and that he was certain it recorded eight gunshots: one gunshot, a pause, and then seven more in rapid succession. Jankowski then explained his firearm experience, and the prosecutor asked, "based on all your training, the evidence collected, and then this camera that we see and the location of the

10

white sedan, what do you believe happened with relation to the gunshots?" Jankowski responded: "So I believe that as the white sedan is rounding the corner, they are pulling up alongside [O.Z.]'s vehicle to the point where the driver's window of the white sedan is directly adjacent to the driver's window of [O.Z.]'s vehicle. I believe it's at that point that the first round is fired striking [O.Z.] in the face."

The prosecutor then asked Jankowski to explain why he believed this. Jankowski responded, "For several reasons. One, if [O.Z.] is turning to look and see who is directly next to him, that is how that round is going to be fired directly into his nose and then run down his trachea into his aortic bifurcation. If that round were fired behind him, [O.Z.] would have had to have been sticking his head all the way out of the vehicle and literally be facing almost head-on the gunfire that's coming in his direction, which we clearly don't see in that vehicle or in that video."

Jankowski then speculated that "after [O.Z.] was hit, he likely took his foot off the brake of his vehicle causing his vehicle to roll at—I don't know—I guess probably five to ten miles an hour into the parked vehicle ahead of him. And because [O.Z.] was probably in great pain and distracted by the fact he had just been shot, he was not attempting to steer the vehicle in any sort of fashion. And then as the vehicle collides with the vehicle in front of him, the suspect vehicle either pulls slightly ahead or was already slightly ahead, given the fact that [O.Z.]'s vehicle had pulled forward. It was at that point that the additional shots were fired in the direction of [O.Z.]'s vehicle, which explains why they would be at an angled trajectory toward the rear of his vehicle."

The prosecutor then showed Jankowski a picture of the blood splatter inside O.Z.'s car and asked him if it factored into his "opinion as to when and

11

where [O.Z.] was shot." Jankowski responded that the direction of the splatter was consistent with his theory that the first shot hit O.Z. in the face as he was turned towards the passing white sedan. During this testimony, Rouston's attorney did not make any objections.

Later on the second day of trial, the prosecution played the video of the body-worn camera of the officer who interviewed P.C. shortly after the shooting. The prosecution then recalled Jankowski to the stand. The prosecutor asked him if, "based on the testimony that [we heard] and body-worn camera that we reviewed from P.C.," he had "any opinion about putting together the evidence with the testimony." Jankowski began to answer, but defense counsel objected, contending the question was not the proper subject for an expert opinion and invaded the province of the jury. The trial court overruled the objection.

Jankowski responded, "So after seeing the spent shell casing lodged in the handgun and after reviewing the video from the dash camera, my belief was that after the first round was fired, it was fired specifically from the black handgun because the round had become jammed." Jankowski continued, "In this case, it made sense to me that after firing the first round and the gun jamming, that the driver, who was also armed with a handgun, fired additional rounds at the vehicle." Rouston's counsel again objected, "Assumes facts not in evidence." The trial court sustained the objection and struck the statement.

The prosecutor then again asked Jankowski's opinion regarding the car's direction of travel and from where the shots were fired. Defense counsel again objected; this time the court overruled the objection. Jankowski responded, "So I believe that the first round—which I believe came from the black handgun, as it had the round that had jammed—was the round that

12

was used to actually strike [O.Z.]"  Jankowski then stated, "[A]ll the other rounds were fired from an angle, and as we can clearly see from the dashcam video, that [O.Z.] is not sticking his head out the window and exposing himself to that potential angle of fire, coupled with the fact that the interior of the vehicle did not have any signs of those rounds that were fired at an angle coming through the vehicle that potentially could have struck him, I personally concluded that the round that hit [O.Z.] had likely come from the black handgun."

Defense counsel objected, "Assumes facts not in evidence that it was the black handgun that actually—."  The court interrupted and overruled the objection, asking the detective, "This is based on your investigation?"  Jankowski confirmed it was, and the court again stated the objection was overruled.

When Jankowski was called to the stand for a fourth time, the prosecutor asked, "Based on the evidence we have reviewed, the forensic evidence, the guns recovered, and what we understand about malfunction, do you have an opinion as to which gun fired that first shot?"  Jankowski answered, "I believe it was the black ghost gun."  The prosecutor then asked, "And based on the witness testimony, who was holding the black ghost gun?"  Defense counsel objected, "Assumes facts not in evidence," but the trial court again overruled the defense objection.  Jankowski answered, "I believe it was Mr. Rouston."  The prosecutor asked, "And whose witness testimony was that based off of?"  Jankowski answered, "Mostly [P.C.]'s testimony."

## II

### *Legal Standards*

Evidence Code section 801 provides:  "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion

13

as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter ... that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

"[U]nder Evidence Code section 801, the trial court acts as a gatekeeper to exclude speculative or irrelevant expert opinion. ... '[T]he expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors.... [¶] Exclusion of expert opinions that rest on guess, surmise or conjecture [citation] is an inherent corollary to the foundational predicate for admission of the expert testimony: will the testimony assist the trier of fact to evaluate the issues it must decide?" ' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770 (*Sargon*).) "Under section 801, therefore, the trial court must exclude speculative or irrelevant expert opinion." (*Garner v. BNSF Railway Co.* (2024) 98 Cal.App.5th 660, 675.)

As a general rule, an expert may give testimony in the form of an opinion only if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a); *People v. Sandoval* (2015) 62 Cal.4th 394, 414–415; see *People v. Dejourney* (2011) 192 Cal.App.4th 1091, 1110.) In cases " ' " ' [w]here the jury is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions, then the need for expert testimony evaporates.' " ' " (*Burton v. Sanner* (2012) 207 Cal.App.4th 12, 19.) Thus, "[e]xpert testimony will be excluded ' " 'when it would add nothing at all to the jury's common fund of information, i.e., when "the subject of inquiry

14

is one of such common knowledge that men [and women] of ordinary education could reach a conclusion as intelligently as the witness." ' " ' " (*Ibid.*; see *People v. Jones* (2012) 54 Cal.4th 1, 60; *Dejourney,* at p. 1110.)

Otherwise admissible expert opinion testimony "is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805; *People v. Prunty* (2015) 62 Cal.4th 59, 89.) "However, the admissibility of opinion evidence that embraces an ultimate issue in a case does not bestow upon an expert carte blanche to express any opinion he or she wishes. [Citation.] There are limits to expert testimony, not the least of which is the prohibition against admission of an expert's opinion on a question of law." (*Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1178 (*Summers*).) Critically, "[e]ven if an expert's opinion does not go to a question of law, it is not admissible if it invades the province of a jury to decide a case." (*Id.* at p. 1182.)

"Expert opinions which invade the province of the jury are not excluded because they embrace an ultimate issue, but because they are not helpful (or perhaps too helpful). '[T]he rationale for admitting opinion testimony is that it will assist the jury in reaching a conclusion called for by the case. "Where the jury is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions, then the need for expert testimony evaporates." [Citation.]' [Citations.] In other words, when an expert's opinion amounts to nothing more than an expression of his or her belief on how a case should be decided, it does not *aid* the jurors, it *supplants* them." (*Summers, supra*, 69 Cal.App.4th at p. 1183.)

"Except to the extent the trial court bases its ruling on a conclusion of law (which we review de novo), we review its ruling excluding or admitting expert testimony for abuse of discretion. [Citations.] A ruling that

15

constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' [Citation.] But the court's discretion is not unlimited, especially when, as here, its exercise implicates a party's ability to present its case. Rather, it must be exercised within the confines of the applicable legal principles." (*Sargon, supra*, 55 Cal.4th at p. 773.)

III

*Jankowski Provided Improper Opinions on Rouston's Guilt*

With these legal principles in mind, we conclude that Jankowski provided improper opinions on Rouston's guilt. His explicit testimony that Rouston fired the weapon that wounded O.Z. was "too helpful" and supplanted the jury's role. (*Summers, supra*, 69 Cal.App.4th at p. 1183.) The admissibility of an expert's opinion hinges on " 'whether the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' " (*People v. Brown* (1981) 116 Cal.App.3d 820, 827, quoting *People v. Cole* (1956) 47 Cal.2d 99, 103.) When an expert testifies to conclusions that a lay jury can draw, it suggests " ' "that the judge and jury may shift responsibility for decision to the witnesses." ' " (*Brown,* at p. 828.)

Here, Jankowski could only have inferred that Rouston, and not Navarro, fired the ghost gun from P.C.'s statement to the investigating police officer that the passenger fired a black gun, which Jankowski opined was the jammed ghost gun, and the other evidence identifying Rouston as that passenger. Jankowski stated as much during his testimony, telling the jury he drew this conclusion primarily from P.C.'s testimony. This inference

16

required no expertise, and Jankowski brought no expertise to bear on the issue. The jury heard the other witness testimony and was equally competent to "weigh the evidence and determine what the facts were[.]" (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.)

Indeed, the trial court recognized early in the trial that Jankowski was walking close to the line of giving improper testimony on the issues of who fired the shot that struck O.Z. and on Rouston's guilt. After Jankowski testified that Rouston's tattoos led Jankowski to arrest Rouston based on the surveillance footage from a nearby apartment complex, defense counsel objected. The objection was sustained and at the next break in the trial, defense counsel asked for a mistrial. During that discussion, the trial court noted that in determining if the expert crossed the line, it would be improper for Jankowski to state, " 'In my belief as a detective in the Gang Unit, that man is guilty of murder,' and he points to the defendant." The court stated, "That would be clearly improper." After some additional discussion, the court reiterated the point, "I just don't want him testifying, 'That Rouston guy over there, yeah, he is the killer in my opinion.' That's clearly inappropriate."[5]

Despite this discussion, on the last day of the trial, when Jankowski was called to the witness stand for a fourth time, the prosecutor played the dashcam video for the jury, stopped it after the first shot was heard, and asked Jankowski for his opinion on which gun fired that shot. Jankowski responded, "I believe it was the black ghost gun." The prosecutor then asked, "And based on the witness testimony, who was holding the black ghost gun?"

---

[5] In addition, the court struck a portion of Jankowski's testimony that crossed the line during his third time on the witness stand, when he speculated the driver fired the Ruger after the bullet from the ghost gun struck O.Z.

17

Over defense counsel's objection, Jankowski answered, "I believe it was Mr. Rouston."[6]

Given Jankowski's status as a gang expert, the designated investigator who testified repeatedly throughout the trial, and a detective, "the jury had every reason to look to [Jankowski] as a far better judge than they could be" regarding the reliability of other witnesses' testimony, and what inferences to draw from the prosecution's other evidence. (*People v. Brown* (2016) 245 Cal.App.4th 140, 172.) Jankowski, "in essence, invited the jury to abdicate its duty to decide the issue" and defer to his assessment that Rouston fired the ghost gun and shot O.Z. in the face. (*Id*. at p. 165.) Because Jankowski's testimony usurped the jury's role, the trial court abused its discretion by allowing it.

---

[6] The Attorney General points to *People v. Singleton* (2010) 182 Cal.App.4th 1 to support his assertion that Jankowski's testimony was proper because it "offered an interpretation of [eyewitness] testimony that hinged on his own expert assessment of the other evidence presented at trial." *Singleton*, a police excessive force case, considered the testimony of a retired police officer with expertise "in controlling arrestees." (*Singleton,* at p. 10.) The retired officer opined based on his viewing of a recording of part of the incident in question that the defendant police officer had control over the victim arrestee at the time of the alleged assaults. The court rejected the defendant's assertion that the officer's opinion was not beyond the common experience of the jurors because the officer "explained control techniques he saw [defendant] use and opined whether [defendant] appeared to have control of [the victim]." (*Id*. at p. 21.) The Attorney General points to no analogous expertise Jankowski provided in opining that Rouston used the ghost gun to fire the bullet that struck O.Z.

*Rouston Forfeited His Objections to*
*Jankowski's Testimony Based on Lack of Expertise*

The Attorney General contends that Rouston forfeited some of the arguments he makes concerning Jankowski's testimony by failing to object at trial. Specifically, the People contend Rouston forfeited his arguments that Jankowski was not qualified to render opinions on the sequence and location of the gunshots based on their "angled trajectory," blood splatter, and the trajectory of the bullet lodged in O.Z.'s neck. Rouston responds that the issues were preserved for appeal by the court's order granting his motions in limine to exclude improper expert testimony and to preserve the issue without additional objection during the trial.[7]

We agree with the People that these arguments were not sufficiently preserved for appellate review. Whether an evidentiary objection is preserved for review by a pretrial motion is determined by the precise subject matter of the in limine motion and ruling. "In some cases, a specific objection to a particular body of evidence can be advanced and ruled upon definitively on a motion *in limine,* thus satisfying the requirements of [Evidence Code

---

[7] The Attorney General's forfeiture argument is directed only to Rouston's claim on appeal that Jankowski gave unqualified opinions related to ballistics, firearms, blood splatter, and medical forensics. As set forth in section I, the record is clear that Rouston's trial counsel objected to the opinions Jankowski rendered about the identity of the person who shot O.Z. Thus, the forfeiture argument is not directed to the challenge to this testimony, which we have concluded was erroneously admitted.

section 353[8]].” (*People v. Morris* (1991) 53 Cal.3d 152, 189, disapproved on other grounds by *People v. Stansbury* (1995) 9 Cal.4th 824 (*Morris*).)  If the motion’s objection is “specific,” “directed to an identifiable body of evidence,” and “advanced at a time when the trial judge could give fair consideration to the admissibility of the evidence in its context,” no further objection or motion is necessary to preserve the issue.  (*Morris,* at p. 189.)

In other cases, a pretrial motion will be insufficient to preserve an evidentiary objection for appeal.  “For example, it may be difficult to specify exactly what evidence is the subject of the motion until that evidence is offered.  Actual testimony sometimes defies pretrial predictions of what a witness will say on the stand.  Events in the trial may change the context in which the evidence is offered to an extent that a renewed objection is necessary to satisfy the language and purpose of Evidence Code section 353.” (*Morris, supra*, 53 Cal.3d at pp. 189–190.)  “ ʻ[U]ntil the evidence is actually offered, and the court is aware of its relevance in context, its probative value, and its potential for prejudice, matters related to the state of the evidence at the time an objection is made, the court cannot intelligently rule on admissibility.ʼ  [Citation.]  In these kinds of circumstances, an objection at the time the evidence is offered serves to focus the issue and to protect the record.”  (*Ibid*.)

---

8      Evidence Code section 353 provides:  “A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion; and [¶] (b) The court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice.”

Here, on the second day of trial, Jankowski took the stand and described the theory of the case that he developed based on his examination of the dashcam video, the bullet holes in O.Z.'s car, the way the bullet entered O.Z.'s face, and the blood and other matter that was left in O.Z's car after he was shot. Jankowski opined, *without objection*, that the sequence of the gunshots audible on the dashcam video suggested that the ghost gun fired one bullet and jammed, that first bullet hit O.Z. as his face was turned to see the Ford sedan passing by, and that the Ruger fired seven shots that hit the outside of O.Z.'s car. Jankowski also theorized that after O.Z. was hit by the bullet from the ghost gun, stunned and injured, he took his foot off the brake of his car and rolled into the car parked in front of him. During this testimony, Rouston's defense counsel again made no objections.

As discussed, Rouston relies solely on his successful motion in limine before trial to preserve the issue for our review. However, that motion did not address the exclusion of the type of testimony at issue here. Rather, the motion requested that the court preclude any expert from opining on Rouston's *guilt* and on the *credibility* of other witnesses. Because these arguments were not directed to the testimony Rouston challenges, the court's order granting the in limine motion was not sufficient to preserve the argument for our review. (See *Morris, supra,* 53 Cal.3d at p. 190.)

However, while we agree with the Attorney General that these arguments were forfeited, we note that Jankowski's extensive testimony on these topics, which was largely based on the testimony of other witnesses, amplified the force of his improper testimony about Rouston's guilt. On this point, Rouston argues that Jankowski acted "as an 'overview witness' to summarize" the prosecution's "case, fill in gaps, and resolve conflicts and ambiguities in the evidence through [his] improper opinion[s]." In support of

this concept, Rouston looks to federal case law, where the circuit courts have defined an overview witness as "a government agent who testifies in a criminal matter as the prosecution's first witness (or at least as one of its earliest witnesses) and provides an overview of the prosecution's case to come." (*United States v. Brown* (1st Cir. 2012) 669 F.3d 10, 24.)

Federal courts have described this type of testimony as "inherently problematic" because "(1) the jury could be influenced by statements of facts and credibility determinations not in evidence; (2) later testimony could be different from what the overview witness assumed; and (3) the jury may place greater weight on evidence that they perceive has the imprimatur of the government." (*United States v. Brown, supra*, 669 F.3d at p. 24; see also *United States v. Agramonte-Quezada* (1st Cir. 2022) 30 F.4th 1, 19 [" 'Testimony by a law enforcement agent constitutes impermissible "overview" testimony when it effectively opines that a defendant is guilty "based on the totality of information gathered" in the agent's investigation, rather than relaying the agent's first-hand experiences and observations." [Citations.] '[H]aving [an agent] so testify amount[s] to simply dressing up argument as evidence.' "]; *United States v. Banks* (10th Cir. 2018) 884 F.3d 998, 1023 [" 'overview testimony is susceptible to abuse,' such as when a witness testifies about a defendant's truthfulness or likelihood of being involved in a crime' "]; and *United States v. Garcia* (2d Cir. 2005) 413 F.3d 201, 214 [overview or summary law enforcement witnesses are "particularly problematic in criminal cases because [they] allow[] 'the government to paint a picture of guilt before the [supporting] evidence has been introduced' "].)

The federal courts have also held that a "summary" law enforcement witness, "who testif[ies] at the end of the government's case instead of the beginning," similarly creates "the possibility that the credibility of the

22

summary witness may be substituted for the credibility of the evidence summarized." (*United States v. Flores-de-Jesus* (1st Cir. 2009) 569 F.3d 8, 18.) Regardless of when summary testimony by a law enforcement agent is presented during a trial, such testimony is inherently " 'problematic because juries may place greater weight on evidence perceived to have the imprimatur of the government.' " (*Id.* at pp. 17, 19; see also *United States v. Perez-Ruiz* (1st Cir. 2003) 353 F.3d 1, 13 ["It follows inexorably that the prosecution cannot prop up a dubious witness by having a government agent place the stature of his office behind the witness. [Citation.] Although the prosecution's success often depends on its ability to convince the jury of a particular witness's credibility, it cannot entice the jury to find guilt on the basis of a DEA agent's opinion of the witness's veracity."].)

Although Jankowski did not provide an overview of the case at the start or the end of the prosecution's presentation of evidence, his repeated testimony throughout trial, including to summarize the testimony of other witnesses and to provide his theory about Rouston's guilt, was problematic for the same reasons as that of an overview witness. The jury likely placed significant weight on the statements of the lead detective in the case

summarizing the testimony of the other witnesses, and possibly substituted the credibility of Jankowski for that of the percipient witnesses.[9]

## V

### *The Admission of Jankowski's Opinion That Rouston Fired the Bullet That Struck O.Z. Prejudiced His Defense and Requires Reversal of The Jury's Verdict*

We review the erroneous admission of evidence in violation of state law under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Prieto* (2003) 30 Cal.4th 226, 247.)  Reversal is required where it is reasonably probable that the jury would have reached a result more favorable to appellant absent the error.  (*Ibid.*)  Probability " ' "does not mean more

---

[9]    We also note that the force of Jankowski's testimony was amplified by his dual role as percipient and expert witness.  As with the concept of an overview witness, the federal courts have also identified inherent problems that are created by this type of dual testimony.  For example, in *United States v. Vera* (9th Cir. 2014) 770 F.3d 1232, the Ninth Circuit partially reversed a narcotic offense conviction after an investigator in the case testified as both an expert in drug jargon and as a lay witness.  (*Id.* at pp. 1241–1243.)  The court noted that without adequate jury instruction, such dual capacity testimony raises serious "concerns" because "an agent's status as an expert could lend him unmerited credibility when testifying as a percipient witness, cross-examination might be inhibited, jurors could be confused and the agent might be more likely to stray from reliable methodology and rely on hearsay." (*Id.* at p. 1242; see also *id.* at p. 1243 [district court's failure to "instruct the jury on how to appropriately" distinguish expert and lay testimony "substantially heightened the 'risk that the jury [would] defer to the officer's superior knowledge of the case and past experiences with similar crimes' "]; *United States v. Torralba-Mendia* (9th Cir. 2015) 784 F.3d 652, 658 ["We have cautioned district courts about the dangers of allowing a case agent to offer both expert and lay opinion testimony."]*; United States v. Freeman* (9th Cir. 2007) 498 F.3d 893, 903 ["a case agent who testifies as an expert receives 'unmerited credibility' for lay testimony"].)  Similar concerns were created in this case by Jankowski's repeated trips to the witness stand in a dual capacity.

likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." ' " (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050, italics in original.) However, where the erroneous admission of evidence results in a fundamentally unfair trial in violation of an appellant's constitutional rights, the appellate court will reverse unless the error is harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; see *People v. Julian* (2019) 34 Cal.App.5th 878, 890.)

Rouston contends the trial court's errors with respect to Jankowski's testimony were prejudicial under either standard of review. The Attorney General asserts that Rouston's rights under the federal constitution were not implicated and, thus, the *Watson* standard applies. We need not reach this issue because we conclude that the admission of Jankowski's testimony concerning who fired the bullet that struck O.Z. was prejudicial under the less stringent *Watson* standard.

Jankowski opined on the central issue in the case—whether Rouston fired a gun. This improper testimony established the specific intent necessary to prove premeditated attempted murder and conspiracy to commit murder under either a direct perpetrator or aider and abettor theory. (*People v. Swain* (1996) 12 Cal.4th 593, 607 ["a conviction of conspiracy to commit murder requires a finding of intent to kill"]; *People v. Lee* (1987) 43 Cal.3d 666, 670 ["specific intent to kill is a requisite element of attempted murder"]; *People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690 [firing a gun at victim sufficient to support inference of intent to kill].) Evidence that Rouston fired a gun also constituted direct evidence of a violation of section 246, firing at an occupied vehicle, and the firearm enhancements under section 12022.53, subdivisions (b), (c), (d), and (e)(1). (See CALCRIM Nos. 965, 3146, 3148.)

Without Jankowski's improper testimony that Rouston fired the shot that struck O.Z., there is a reasonable probability the jury would have reached a different result. To support its theory that Rouston was the shooter of the bullet that struck O.Z., the state presented the conflicting testimony of P.C., and the out-of-court statements of O.Z.'s neighbors, A.C. and P.C., which were relayed to the jury through a prosecution investigator and a police officer, respectively. While on the witness stand, A.C. stated that on the day of the shooting he briefly spoke with O.Z. before O.Z. got into his car, but that he did not see the shooting because as soon as he heard gunshots he ducked behind a nearby parked car. This testimony was then impeached by the District Attorney's investigator who told the jury that witnesses to gang crimes are often scared to cooperate with the prosecution because they fear retaliation from the gang and that A.C. volunteered to him that both passengers in the white sedan fired at O.Z.

For her part, P.C. was also not forthcoming on the witness stand. During her testimony, she stated that she told the police at the scene there were two men in the white car, but that she could not remember much else about the shooting. P.C. eventually testified that she did see two men in the car and both had guns. The prosecution then played for the jury the body-worn camera video of P.C.'s interview in which P.C. stated she saw both men fire a gun. The testimony of both of these witnesses, who provided the primary evidence of the actual shooting, was inconsistent. Without Jankowski's authoritative opinion that Rouston was the shooter, this evidence held far less weight.

Other prosecution evidence was also bolstered by Jankowski's improper testimony—based on the other witnesses' statements—that Rouston fired the first bullet from the ghost gun and that it struck O.Z. in the face. The

criminalist who conducted the DNA testing on the guns testified that Rouston was not a likely contributor to DNA found on the ghost gun and his DNA was not present on the Ruger. I.L. did tell an officer at the scene that the driver had fired a "Glock-style handgun," but made no mention of the passenger holding or firing a gun.

In addition, two requests made by jury during its deliberations showed uncertainty about whether Rouston was the shooter. The jury asked for the testimony of P.C., A.C., and the police officer who relayed the statements of I.L. The jury also asked if the theory of aiding and abetting could be applied to count 3, firing at an occupied vehicle, and the personal firearm use allegation. These questions suggested the jury's deliberations concerning whether Rouston fired a gun were close. (See *People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295 ["Juror questions and requests to have testimony reread are indications the deliberations were close."].)

In sum, Jankowski's testimony that Rouston was the shooter bolstered the witness testimony that favored the prosecution and minimized the inconsistencies in that evidence. By his testimony, Jankowski improperly relayed to the jury his opinion that Rouston fired the bullet that hit O.Z., and also strengthened the testimony of the other witnesses in a way that supported this opinion. Even the trial court observed during a discussion of the aiding and abetting jury instructions that it "would be very easy to find that [Rouston was] not the shooter."

The Attorney General argues that, in spite of the error in admitting Jankowski's improper testimony, Rouston would still have been convicted as an aider and abettor or co-conspirator without proof that he fired a gun. However, without this evidence, it is not clear the jury would conclude Rouston harbored the specific intent to kill required for the attempted

murder and conspiracy to commit murder convictions, or to establish Rouston's intent to shoot at an occupied vehicle. (See *People v. Ware* (2022) 14 Cal.5th 151, 163 ["Conspiracy ' "is an inchoate offense, the essence of which is an agreement to commit an unlawful act." ' [Citation.] This crime has four elements: (1) the existence of an agreement between at least two persons; (2) the specific intent to agree to commit an offense; (3) the specific intent to commit the offense that is the object of the agreement; and (4) an overt act in furtherance of the conspiracy, which may be committed by any conspirator."].)

Rouston's gang membership, presence in the car, the earlier gang killings, and presence when B.R. was killed provided a motive for the attempted murder, but do not conclusively establish his intent to kill. For instance, there was no evidence at trial concerning Rouston's whereabouts or activities prior to being in the car with Navarro, let alone evidence of an agreement or plan to kill anyone. (See *People v. Boyd* (1990) 222 Cal.App.3d 541, 556–557 ["To be liable for a crime as an abettor, the accused must have instigated or advised the commission of the crime or have been present for the purpose of assisting the crime. He must share the criminal intent with which the crime was committed. Neither his mere presence at the scene of the crime nor his failure, through fear, to prevent a crime establishes, without more, that an accused was an abettor."].)

The Attorney General also points to the gang enhancement finding and conspiracy verdict as evidence that the jury found a specific intent to kill. However, the gang enhancement does not require a finding of intent to kill, only the intent to assist in "criminal conduct by gang members." (See § 186.22; CALCRIM No. 1401.) More importantly, the jury likely considered Jankowski's improper testimony in reaching its verdict on the conspiracy

28

charge and the gang enhancement. In light of the lack of any direct evidence of the agreement required to prove conspiracy, the jury likely relied on Jankowski's improper opinion that Rouston fired a gun to infer a prior agreement with Navarro to kill O.Z. Additionally, as the People concede, the court gave an erroneous jury instruction indicating implied malice was sufficient to prove the mental state required for conspiracy, further calling into question any finding of intent to kill based on the conspiracy verdict.

We agree with Rouston that absent Jankowski's authoritative testimony that the ghost gun fired the bullet that struck O.Z., and that Rouston was the shooter of that weapon, it is reasonably probable that the jury's result would have been different. Without Jankowski's compelling statements, at least one member of the jury might not have found beyond a reasonable doubt that Rouston was guilty of these crimes. Because of this prejudicial evidentiary error, we conclude reversal of the convictions is required.

## DISPOSITION

The judgment of conviction is reversed. The cause may be retried.

McCONNELL, P. J.

WE CONCUR:

BUCHANAN, J.

CASTILLO, J.